**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-14-0000844**
**12-MAR-2019**
**07:51 AM**

NO. CAAP-14-0000844

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
KAPAHUKULA KALE VOORHEES, Defendant-Appellant

APPEAL FROM THE DISTRICT COURT OF THE THIRD CIRCUIT
(CASE NO. 3DTA-13-01793)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Reifurth and Hiraoka, JJ.)

Defendant-Appellant Kapahukula Kale Voorhees (**Voorhees**) appeals from the Judgment and Notice of Entry of Judgment (**Judgment**) entered by the District Court of the Third Circuit (**District Court**)[1] on April 22, 2014. Voorhees contends that the District Court erred by:

    1. admitting the arresting officer's testimony about the results of the horizontal gaze nystagmus[2] (**HGN**) test performed on Voorhees;

---

[1]    The Honorable Joseph P. Florendo presided.

[2]    Nystagmus is a well-known physiological phenomenon that has been defined by one medical dictionary as "an involuntary rapid movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties." HGN or jerk nystagmus is a particular type of nystagmus "characterized by a slow drift, usually away from the direction of gaze, followed by a quick jerk or recovery in the direction of gaze." Stated otherwise, it "is the inability of the eyes to maintain visual fixation as they are turned from side to side." . . . [I]t has been well-documented through research studies over the years that alcohol intoxication affects eye movement and nystagmus becomes more pronounced with alcohol consumption.

State v. Ito, 90 Hawaiʻi 225, 230-31, 978 P.2d 191, 196-97 (App. 1999) (citations omitted).

2.      finding Voorhees guilty of Operating a Vehicle Under the Influence of an Intoxicant (**OVUII**) despite there being insufficient evidence of impairment;

3.      finding Voorhees guilty of Refusal to Submit to a Breath, Blood, or Urine Test (**Count 5**); and

4.      finding that Voorhees knowingly, intelligently, and voluntarily waived the right to a jury trial.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, as well as the relevant statutory and case law, we reverse the Judgment as to Count 5 only.  The Judgment is otherwise affirmed.

## I.

On July 17, 2013, a complaint was filed in the District Court charging Voorhees with OVUII (Count 1), driving without a license (Count 2), operating an uninsured vehicle (Count 3), resisting arrest (Count 4), refusal to submit to a breath, blood, or urine test (Count 5), and failing to obey a police officer (Count 6).  The charges arose from an incident that allegedly took place on June 15, 2013.

On September 30, 2013, Voorhees pleaded not guilty and waived his right to a jury trial.  Voorhees' jury-waived trial began on January 7, 2014, and continued on April 22, 2014.  The District Court found Voorhees guilty on Counts 1, 2, 3, 4, and 5, but not guilty on Count 6, and entered the Judgment accordingly. In this appeal, Voorhees challenges the Judgment on the grounds that he did not knowingly, intelligently, or voluntarily waive his right to a jury trial.  He also specifically challenges the Judgment as to Counts 1 (OVUII) and 5 (refusal to submit to a breath, blood, or urine test); he does not specifically challenge the Judgment as to Counts 2 (driving without a license), 3 (conditions of operation and registration of motor vehicles), or 4 (resisting arrest).

## II.

### A.    Voorhees Waived His Right to a Jury Trial

We address this issue first because it is potentially dispositive of Voorhees' entire appeal.

> The validity of a criminal defendant's waiver of his or her right to a jury trial presents a question of state and federal constitutional law.  We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard.

State v. Gomez-Lobato, 130 Hawai'i 465, 468-69, 312 P.3d 897, 900-01 (2013) (ellipsis and citation omitted).

A criminal defendant is statutorily entitled to a trial by jury when the potential penalty for the charged crime is imprisonment for six months or more.[3]  HRS § 806-60 (1985).  A criminal defendant may also waive the right to a jury trial. HRS § 806-61 (1985).

> Generally, the waiver shall be either by written consent filed in court or by oral consent in open court entered on the record.  HRPP [Hawai'i Rules of Penal Procedure] Rule 23(a).  Although the rule indicates the waiver may be given by written or oral consent, the rule does not relieve the court of its obligation to ensure, through an appropriate oral colloquy in court, that the waiver was knowingly, intelligently, and voluntarily given.  In other words, while the defendant may execute a written waiver form, the court should also engage in an oral colloquy with the defendant to

---

[3]    In Gomez-Lobato the supreme court also noted:

In certain cases, this court has recognized the right to a jury trial under the Hawai'i Constitution for particular offenses even though the maximum authorized terms of imprisonment do not exceed six months.  In this regard, if the maximum term of imprisonment for a particular offense does not exceed thirty days, it is presumptively a petty offense to which the right to a jury trial does not attach. This presumption can only be overcome in extraordinary cases, when [1] consideration of the treatment of the offense at common law, [2] the gravity of the offense, and [3] the authorized penalty for the offense, unequivocally demonstrates that society demands that persons charged with the offense at issue be afforded the right to a jury trial. If the maximum authorized term of imprisonment for an offense is more than thirty days but not more than 180 days, no presumption applies, and the three factors set forth above must be considered to determine whether the right to a jury trial attaches.

130 Hawai'i at 469 n.5, 312 P.3d at 901 n.5 (quotation marks and citations omitted).

3

> establish that the waiver was knowing, intelligent, and
> voluntary. Lastly, where it appears from the record that a
> defendant has voluntarily waived a constitutional right to a
> jury trial, the defendant carries the burden of
> demonstrating by a preponderance of the evidence that
> his/her waiver was involuntary.

Gomez-Lobato, 130 Hawai'i at 469, 312 P.3d at 901 (quotation marks, brackets and some citations omitted). In this case, the District Court engaged in the following colloquy with Voorhees:

> THE COURT: Mr. Voorhees, have you talked to your attorney about your right to a jury trial?
>
> MR. VOORHEES: Yes.
>
> THE COURT: Do you understand what a jury trial is?
>
> MR. VOORHEES: Yes.
>
> THE COURT: Do you wish to give up your right to a jury trial?
>
> MR. VOORHEES: Yes.
>
> THE COURT: Did you read and understand this written waiver form?
>
> MR. VOORHEES: Yes, I did.
>
> THE COURT: Are these your initials in paragraphs 2 through 6?
>
> MR. VOORHEES: Yes, they are.
>
> THE COURT: Is this your signature on the back?
>
> MR. VOORHEES: Yes.
>
> THE COURT: If you give up your right to a jury, the trial will be held in this court without a jury. Do you understand?
>
> MR. VOORHEES: Yes.
>
> THE COURT: [Deputy Public Defender], do you certify that your client's waiver is made knowingly and voluntarily?
>
> [DEPUTY PUBLIC DEFENDER]: I so certify.
>
> THE COURT: I'll accept this waiver and order defendant to return November 4th at 2 o'clock for a pretrial conference.

The "written waiver form" referred to by the District Court was titled "Waiver of Jury Trial" and filed on September 30, 2013. It stated:

> I understand that I have the constitutional right to a
> jury trial. Furthermore, I understand that a jury trial is
> a trial in the Circuit Court before a judge and a jury and

> that I can participate in the process of selecting a jury of
> twelve (12) citizens from the Third Circuit. This jury
> would hear the evidence in my case, and then decide if I am
> guilty or not guilty. Finally I understand that in order
> for me to be convicted by a jury, their vote must be
> unanimous.
>
> I know that if I give up my right to a jury trial, the
> trial will be held in this Court before a judge who alone
> would decide if I am guilty or not guilty. I request that
> my case be tried by a judge.

Voorhees initialed both paragraphs, which recited each of the
four Duarte-Higareda elements.[4] The Waiver of Jury Trial also
stated:

> I acknowledge that Judge Joseph P. Florendo, Jr. . . .
> questioned me personally in open court to make sure that I
> knew what I was doing and understood this form before I
> signed it.

It was signed by Voorhees in two places and initialed by Voorhees
in a total of six places. It was also signed by Voorhees'
defense counsel, who certified:

> As counsel for defendant and as an officer of the
> Court, I certify that I have read and explained fully the
> foregoing, that I believe that the defendant understands the
> document in its entirety, that the statements contained
> therein are in conformity with my understanding of the
> defendant's position, that I believe that the defendant's
> waiver is made voluntarily and with intelligent
> understanding of the nature of the charge and possible
> consequences, and that the defendant signed this form in my
> presence.

In this case, unlike in Gomez-Lobato where the defendant spoke
Spanish and required the assistance of a Spanish-language
interpreter, Voorhees understood and fluently spoke the English
language; he demonstrated this when he testified in his own
defense without an interpreter. We hold that Voorhees has not
satisfied his "burden of demonstrating by a preponderance of the

---

[4] In United States v. Duarte-Higareda, 113 F.3d 1000 (9th Cir.
1997), the federal appellate court held, among other things, that the trial
court was required to inform the defendant that: "(1) twelve members of the
community compose a jury, (2) the defendant may take part in jury selection,
(3) a jury verdict must be unanimous, and (4) the court alone decides guilt or
innocence if the defendant waives a jury trial." 113 F.3d at 1002. Although
the Hawai'i Supreme Court "has advised the trial courts to conduct Duarte-
Higareda's suggested colloquy, [it has] rejected the argument that such a
colloquy is required in every case." Gomez-Lobato, 130 Hawai'i at 470-71, 312
P.3d at 902-03 (citing State v. Friedman, 93 Hawai'i 63, 69, 996 P.2d 268, 274
(2000)) (other citations ommited).

evidence that his[ ] waiver [of the right to a jury trial] was involuntary."  Gomez-Lobato, 130 Hawai'i at 469, 312 P.3d at 901 (citation omitted).

## B. The District Court Did Not Err in Admitting Evidence of the HGN Test

"[A]s long as the HGN test is properly administered and scored by a qualified officer, the HGN test does appear to be a fairly reliable indicator of alcohol impairment."  Ito, supra n.2, 90 Hawai'i at 238, 978 P.2d at 204 n.2 (citations and internal quotation marks omitted).  Before HGN test results can be admitted into evidence in a particular case, it must be shown that (1) the officer administering the test was duly qualified to conduct the test and grade the test results, and (2) the test was performed properly.  Id. at 244, 978 P.2d at 210 (citations omitted).

### 1. Voorhees did not object to the police officer's qualifications.

The police officer who performed the HGN test on Voorhees on June 15, 2013, Officer Joshua Pa (**Officer Pa**) testified that the HGN test is part of the standard protocol used by the Hawai'i County Police Department (**HCPD**) when conducting a DUI checkpoint.  Officer Pa learned to administer the HGN test in June 2011 during recruit training with HCPD.  He attended forty hours of training and a six-hour "wet-lab test."  He passed both. Since recruit training he has had no "refresher training" on the HGN test, but he has conducted "close to forty" HGN tests and testified that he had "[a]ctual training, I do it in the field." That is consistent with the 1984 NHTSA Instruction Manual, which explicitly directs police officers to "[p]ractice until you can consistently estimate 45 degrees.  Check yourself monthly with [an 8" x 15" square template or cardboard with a diagonal line drawn from one corner to another to demark 45 degrees] to be sure that your accuracy has been sustained."  Ito, 90 Hawai'i at 244 n.10, 978 P.2d at 210 n.10 (quoting 1984 NHTSA Instruction Manual, reprinted in 1 Defense of Drunk Driving § 10.99[2], app. at 10-92 (emphasis added)).  Voorhees did not object when the

State asked Officer Pa whether he was certified and qualified to conduct the test under the National Highway Traffic Safety Administration (**NHTSA**) standards. Cf. State v. Ferrer, 95 Hawai'i 409, 424, 23 P.3d 744, 759 (App. 2001) ("As in Ito and Mitchell, the State failed to elicit testimony from the officer that the training he received met the requirements of the NHTSA."). Nor did defense counsel ask to voir dire Officer Pa on his qualifications to perform the HGN test or to or evaluate the results. Under these circumstances, we hold that Voorhees' failure to object constituted a waiver of any objection to Officer Pa's qualifications to perform and evaluate the HGN test. Hawaii Rules of Evidence (**HRE**) Rule 103(a)(1) (Supp. 2006).[5] See also, State v. Villena, 140 Hawai'i 370, 379 n.8, 400 P.3d 571, 580 n.8 (2017) (failure to object at trial constitutes waiver of error).

## 2.   Voorhees did not object to the question about his performance on the HGN test.

> [The validation of the FSTs results] applies *ONLY* **WHEN THE TESTS ARE ADMINISTERED IN THE PRESCRIBED, STANDARDIZED MANNER;** **AND** *ONLY* **WHEN THE STANDARDIZED CLUES ARE USED TO ASSESS THE SUSPECT'S PERFORMANCE; AND,** *ONLY* **WHEN THE STANDARDIZED CRITERIA ARE EMPLOYED TO INTERPRET THAT PERFORMANCE.**
>
> **IF ANY ONE OF THE STANDARDIZED FIELD SOBRIETY TEST ELEMENTS IS CHANGED, THE VALIDITY IS COMPROMISED.**

Ito, 90 Hawai'i at 244, 978 P.2d at 210 (quoting 1995 NHTSA Student Manual, reprinted in part in 1 Defense of Drunk Driving § 10.06[5], at 10-27). (brackets and emphasis in original) (footnote omitted).

> The only equipment needed to administer the HGN test is a stimulus, such as a pen, penlight, or the officer's finger. The stimulus is positioned about twelve to fifteen inches in

---

[5]   HRE Rule 103 provides, in relevant part:

> (a)   Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:
>
> > (1)   Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

> front of a suspect's eyes. As the officer gradually moves
> the stimulus towards the suspect's ear and out of the
> suspect's field of vision, the officer observes the
> suspect's eyeballs to detect three signs of intoxication: an
> angle of onset of nystagmus (measured from the suspect's
> nose) of forty-five degrees or less; distinct or pronounced
> nystagmus at the eye's maximum horizontal deviation; and the
> inability of the eyes to smoothly pursue the stimulus. The
> officer scores one point for each sign of intoxication per
> eye, the maximum score being six points. A person who takes
> the HGN test and receives a score of four or more points is
> classified as having a BAC of over 0.10 percent.

Id. at 231-32, 978 P.2d at 197-98 (footnote and citations omitted). Officer Pa testified about the procedure he followed and what he looked for. The State concedes that Officer Pa never testified how far away from the suspect's eyes he was trained to place the stimulus, or how far away from Voorhees' eyes he actually placed the stimulus (a finger on his left hand). However, he did describe how he conducted the test for onset nystagmus:

> That one you use a stimulus and move it from the
> center of the face, or the nose area. And, say, if you're
> doing it on their left eye, you move it, the stimulus, yeah,
> my finger, slowly where it would take approximately four
> seconds to get from the middle of the eye to about the side
> of the shoulder. You move it slowly, and then you can see
> the eyes start the nystagmus.
>
> . . . .
>
> But you'll be able to see it prior to the forty-five
> -- . . . -- which is approximately the shoulder.

Again, Voorhees did not object when the State asked Officer Pa, "could you please describe how the defendant performed on this test[?]" We hold that Voorhees waived any objection that there was no foundation for the police officer's testimony about the HGN test results. HRE Rule 103(a)(1); see also, Villena, 140 Hawai'i at 379 n.8, 400 P.3d at 580 n.8.

## C.    There Was Substantial Evidence of Impairment

Voorhees contends that the District Court erred by finding him guilty of OVUII because there was insufficient evidence that he was impaired. When reviewing the sufficiency of evidence on appeal, we apply the following deferential standard of review:

The courts have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. Substantial evidence is evidence which a reasonable mind might accept as adequate to support the conclusion of the fact finder. Matters related to the credibility of witnesses and the weight to be given to the evidence are generally left to the factfinder. The appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence. Thus, we need not necessarily concur with a trial court's particular finding in order to sustain a conviction.

State v. Mitchell, 94 Hawaiʻi 388, 393, 15 P.3d 314, 319 (App. 2000) (citations, quotation and internal quotation marks omitted).

The Hawaiʻi OVUII statute provides, in relevant part:

§ 291E-61 [Supp. 2012]. Operating a vehicle under the influence of an intoxicant

(a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:

(1) While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty[.]

HRS § 291E-1 (2007) provides:

"Impair" means to weaken, to lessen in power, to diminish, to damage, or to make worse by diminishing in some material respect or otherwise affecting in an injurious manner.

The District Court recited its findings and conclusions as follows:

Find the defendant guilty of Count 1, Operating a Vehicle Under the Influence of an Intoxicant.

The testimony at trial indicates that the defendant was operating a motor vehicle on Henry Street, in Kailua-Kona, approaching a roadblock at a slow rate of speed. He stopped in the roadway for about five seconds, and then proceeded at a slow rate of speed to the roadblock site.

Officer Pa testified that the defendant was the operator of the motor vehicle; he had red, watery, glassy eyes, slurred speech, and a strong odor of alcohol emanating from his breath. The HGN test was conducted. He showed six of six clues. No other field tests were conducted, because

9

> defendant became uncooperative and combative and refused to perform any other field tests. And by his own testimony, he knew he was going to get arrested, so he went to his girlfriend to get a cigarette.

Voorhees argues, and the State concedes, that there "was no testimony that [Voorhees] exhibited 'slurred speech,' and the trial court's finding that there was such was error."

Voorhees also argues that his performance on the HGN test is relevant only to the issue of probable cause, and is not admissible as proof of impairment, citing Mitchell, 94 Hawai'i at 396-97, 15 P.3d at 322-23. In Mitchell, we noted:

> We have previously held that the results of a[n] HGN test are probative of probable cause, provided that the HGN test was properly administered. "[W]e conclude that HGN test results have been sufficiently established to be reliable and are therefore admissible as evidence that police had probable cause to believe that a defendant was DUI." State v. Ito, 90 Hawai'i 225, 241, 978 P.2d 191, 207 (App. 1999).

Id. Mitchell did not decide the issue of whether or not HGN test results were admissible to prove impairment.

In Ito, we observed that:

> The vast majority of courts across the country that have considered the issue have had no difficulty concluding that as long as the proper foundational prerequisites are met, HGN test results may be admitted as evidence of probable cause to arrest a person for DUI, although not to prove intoxication or that a defendant's BAC exceeded a particular percentage.

90 Hawai'i at 232-33, 978 P.2d at 198-99 (citing cases). But we also noted that:

> "The bulk of the scientific research indicates that the potential error rate of a properly administered HGN test is lower than all [FSTs] that are routinely admitted into evidence." State v. Ruthardt, 680 A.2d 349, 360 (Del.Super.Ct. 1996). For example, the most recent NHTSA research indicates that the HGN test has a sixty-five percent accuracy rate in detecting suspects with 0.08 percent BAC or higher. NHTSA FSTs Validation Study at 17. The walk-and-turn and the one-leg-stand tests, on the other hand, boast only a sixty-one percent and forty-five percent success rate, respectively. Id. Although concerns exist about whether a test was properly administered by an officer in the field who was not properly trained, these concerns go to the weight of the evidence rather than its admissibility. See, e.g., State v. Ruthardt, 680 A.2d at 360; City of Fargo v. McLaughlin, 512 N.W.2d at 707.

<u>Id.</u> at 240, 978 P.2d at 206.  The scope of our holding in <u>Ito</u> was:

> In light of the foregoing analysis, we conclude that HGN test results have been sufficiently established to be reliable and are therefore admissible as evidence that police had probable cause to believe that a defendant was DUI.  Since the issue was not presented, <u>we do not decide whether HGN test results are admissible at trial as evidence of a defendant's intoxication</u>.

<u>Id.</u> at 241, 978 P.2d at 207 (underscoring added).  <u>See also</u>, <u>Ferrer</u>, 95 Hawai'i at 424, 23 P.3d at 759 ("<u>Even if</u> HGN test results are admissible as substantive evidence of intoxication at a DUI trial . . . .") (emphasis added).  We need not decide that legal issue in this case, either, because Voorhees introduced the issue himself at trial.  Voorhees' defense counsel asked Officer Pa, on cross-examination:

> Q     Okay.  As part of your training, are you informed of, I guess, a percentage of error that's likely for each test?
>
> A     In the training that I receive?
>
> Q     Yes.
>
> A     Yes.
>
> . . . .
>
> [DEFENSE COUNSEL]  Let's start with the HGN.
>
> THE WITNESS:  The HGN.  If there's more than four clues in the HGN test, there's a high likelihood that the person is point one -- well, point one percent or higher, the blood alcohol.
>
> Q     . . . Four clues, it's a likelihood of what?
>
> A     Point one percent blood alcohol.
>
> Q     Point one percent.  Okay.  But I'm actually talking about -- you stated on direct that using these tests, you could determine whether someone is intoxicated or not.
>
> A     Yes.  The likelihood.
>
> Q     In all the time you can determine using these tests or some of the time?
>
> A     There's a high likelihood that when the tests are conducted properly that there will be clues of impairment and --
>
> Q     Okay.
>
> A     Most of the time.

> Q      So if you're conducting the test properly, someone is likely to be intoxicated.  Is that what you're saying?
>
> A      Yes.

Thus, Voorhees opened the door for the District Court to consider his performance on the HGN test as evidence of his impairment.

Even without evidence of Voorhees' performance on the HGN test, and the absence of any evidence of slurred speech, there was substantial evidence that Voorhees' "mental faculties or ability to care for [himself] and guard against casualty" were impaired by alcohol.  The police officer who first observed Voorhees' car approaching the checkpoint Officer Eric Reyes **(Officer Reyes)** testified:

> Upon approaching the roadblock, there was [sic] no cars in front of it.  The Honda stopped, fronting the roadblock, beginning of the roadblock, and kind of paused there for a few seconds and slowly crept up into the roadblock.
>
> . . . .
>
> Q      And did you make any observations about the defendant as you were speaking with him?
>
> A      When he was sitting in the driver's seat, he had red, watery, glassy eyes.  And I smelled alcohol emanating from the vehicle.
>
> . . . .
>
> Q      Okay.  And when you had him pull over, did you ask for any kind of documentation?
>
> A      Yes.  Identification, license, insurance, and registration.
>
> Q      And was he able to provide any of those documents?
>
> A      Not with me.

Officer Reyes also described what he observed as Officer Pa was performing the HGN test:

> While participating in the HGN test, Voorhees walked away, back towards his vehicle.
>
> . . . .
>
> Q      . . . And what happened next after the defendant walked away?
>
> A      He walked away.  He went back to his vehicle on the passenger side, and he asked for a lighter from the female seated in the passenger seat.

. . . .

Q       . . . So you said Officer Pa put him under arrest?

A       Yes.  We informed him that he was under arrest.

Q       And how did he respond to that?  How did the defendant respond?

A       Initially he was -- he didn't do anything.  We grabbed his arms to place him in handcuffs.  And he then twisted his body, making it unable to secure the handcuffs.  And then after that he continued walking towards -- away from his vehicle, towards a rock wall about one or two feet from his vehicle.

Q       With the handcuffs on?

A       No.  Handcuffs were not on yet.

. . . .

Q       . . . What happened next after he went to the rock wall without the cuffs on?

A       Again, like I said, he continued resisting, making it unable to put the handcuffs on.  He was flailing left to right, kind of going, spinning around one-eighty and so that we were able to finally take him to the ground.  And that's when the handcuffs were placed on him.

Q       And then what happened next, once he was finally handcuffed?

A       We had to transport him, so he needed to go into the vehicle.  Brought the van up to transport, took him into the van, and he -- I guess handcuffs were still on.  We put him into the van, and he started kicking his legs.

. . . .

Q       . . . How long did it take you to secure the handcuffs on the defendant?

A       Probably wasn't more than a minute.

Q       And how many officers did it take to do that?

A       Four officers.

. . . .

[DEPUTY PROSECUTING ATTORNEY]:  Was the defendant saying anything while he was being -- while the four of you were attempting to put the handcuffs on him?

[Objection overruled]

A       He kept on calling us mahus and that he was going to come and get us.

Q       What was his demeanor while he was making those comments?

[Objection overruled]

> THE WITNESS: Angry, shouting.
>
> . . . .
>
> Q When he first was arriving at the DUI checkpoint, did he have that same kind of demeanor as you mentioned when he was getting arrested?
>
> [Objection overruled]
>
> A On the first contact, initially, no. And then when I asked him to pull over to the side of the road, that's when his demeanor changed.
>
> Q And what -- did he say anything, or he just kind of . . . ?
>
> A Yeah. He said, Are you serious?
>
> Q What was his tone of voice as he said that?
>
> A Wasn't loud. It was just kind of irritated and angry.
>
> Q Okay. And then, when you did pull him over, you asked him to get out of the vehicle?
>
> A No. I asked for license, registration and insurance.
>
> Q And he just remained in the vehicle while he was looking for that?
>
> A Yes.
>
> Q When did the defendant leave the car?
>
> A When Officer Pa came to assist me.
>
> Q And what was his demeanor then, still was irritated and angry?
>
> A Yes. When I originally asked for his license, registration, and insurance, he did pause for a second. He shouted, Kapa.

Officer Pa described similar circumstances:

> Q And what if anything did you see this Honda Accord do as it approached the DUI checkpoint?
>
> A As it approached, it was the only car coming towards us on the roadway. There's no cars in front or behind him. As he was approaching, he was coming at a slower speed, and he stopped in the roadway for a few seconds.
>
> Q Did he have any reason to stop before --
>
> [Objection overruled.]
>
> A There was nothing impeding his lane of travel. There was no cars or anything blocking his way.
>
> . . . .

Q . . . Did you make any observations about the defendant as you saw him?

A As he was sitting in the vehicle, I'd seen that he had really red, watery, glassy eyes.

. . . .

Q Okay. And once you began speaking with the defendant, did you ask him for any kind of documentation?

A Yeah. His license and insurance card.

Q And was he able to provide any of that?

A No.

After describing the HGN test, Officer Pa testified:

Q . . . And then what is the next thing that you administer after all of the HGN tests are over?

A In most cases I requested participation in conducting the walk-and-turn test after --

Q Okay. And did the defendant participate in those?

A No.

Q No. What happened next? What caused him not to do that?

A He basically turned around and walked away and began asking the passenger in the car to pass him a lighter, because he wanted to smoke a cigarette.

Q And did you tell him to stop?

A I did.

. . . .

Q What did he say when you told him to stop?

A He disregarded me. He just kept asking for his lighter.

Q Did he say anything at all?

A He asked -- he said an expletive and asked for his lighter.

[Objection overruled]

THE WITNESS: He said, Fuck.

. . . .

THE WITNESS: I don't recall exactly what his words were. But he asked for the lighter, and I remember him swearing and asking for his lighter.

Q In an agitated way?

A He was very agitated and upset.

. . . .

Q      . . . And so again, you said he was -- you put him under arrest.  What happened?  You just -- it was kind of standard, put him under arrest?

A      No.  He -- I advised him he was going to be placed under arrest at which time I took ahold of his left arm.  And then Officer Reyes was also there.  And he began pulling away, resisting, not giving -- not cooperating.  He was just pulling -- trying to hide his arms.  And he was on the vehicle.  And he just kept yelling and swearing and saying -- resisting our orders.  I was giving clear, loud, verbal commands to stop resisting.

Q      He was yelling?

A      And he disregarded those.

Q      Expletives again?

A      Yes

Q      And resisting?

A      Yeah.

Q      So what happened?  Were you eventually able to get him arrested on your own?

A      No.  There was my sergeant, who was also at the DUI checkpoint, him and Officer Hookano were quite a few yards away from us.  And they ran up towards our location and then helped eventually get him under arrest.  He was --

Q      So basically it took all four of you guys --

A      Yes, yes.

Q      -- to get him in handcuffs?

. . . .

Q      So what happened next after you guys finally got him handcuffed?

A      After he was handcuffed, we were escorting him back to the transport vehicle, which is a blue-and-white van.  And he was -- we were trying to place him into the back portion of the van, which is at the rear of the vehicle.  And as we were trying to put him into the van, he kept resisting.  He ended up being placed in there on his back, and he was kicking towards us, trying to kick us.

Officer Reyes' and Officer Pa's sergeant Sgt. Aaron Carvalho (**Sgt. Carvalho**) testified:

Q      . . . And then what did you observe next?

A      Momentarily, while continuously glancing over, I observed the defendant to be walking away from both Officers Pa and Reyes.  I then heard statements from Officers Pa and Reyes saying, Stop resisting.  And it appeared that they were trying to take control of Mr. Voorhees.

Q     What did you do next?

A     I immediately ran to the area.

Q     Is there a reason why you would have ran there instead of just kind of walking over?

A     It appeared to me that a person was resisting arrest at this time physically, and so I ran there to safely effect the arrest.

Q     Okay.  Were you the only one that ran over?

A     No, sir.

Q     Who else ran over?

A     Officer Hookano.

. . . .

Q     . . . . What happened once the defendant was ultimately put in handcuffs?

A     Once he was put in handcuffs, he continued to struggle physically while he was on the ground.  We were able to roll him up onto his bottom and then stand and then walk him to the back of the police subsidized van where he continued to struggle, or resist, I should say, as we placed him within the van.

Q     Could you describe how he was resisting and struggling.

A     He was not complying with verbal commands.  He was pulling away.  He was kicking with his feet.  In the back of the van there's a gate and a step to go up -- so as to prevent the closing of the gate once he was in.

Q     And was he making any statements while he was resisting?

[Objection overruled]

A     While he was initially resisting the arrest while we were still on the sidewalk, he did make several statements, swearing and using obscenities.

. . . .

Q     What statements did he make while he was resisting?

A     He stated, Fuck you guys.  I take you all on. You all a bunch of mahus.

. . . .

Q     Okay.  When you said it took four of you to ultimately get handcuffs on the defendant, is there a reason for that?

A     The reason it took four of us?

Q     Right.

A    The defendant was not compliant with any verbal commands to place his hands behind his back, to stop resisting, to remain calm. The initial incident from the standing position took two officers. And then the two of us came running. Four of us attempted to gain control, placing his hands behind his back. It moved from the defendant being pressed against his vehicle to the stone wall, which is located right next to his vehicle, and then finally being taken to the ground.

Once there, due to his size, his strength, basically I was securing both legs, an officer was on one arm, an officer was on another arm, and the fourth officer was trying to keep his body down, up by his back and shoulder blades area. So due to his size and his strength at that night or during that night, it took all four of us to subdue him --

Q    Because he was --

A    -- or place him into handcuffs.

Similarly, the fourth police officer on duty at the checkpoint that night Officer Kalena Hookano (**Officer Hookano**) testified:

Q    Can you describe how Mr. Voorhees was, did you say, struggling with the officers?

A    Well, on a normal test where officers run 'em through the Standardized Field Sobriety Tests, they don't touch the person. So when I looked over, it looked like they were trying to place him under arrest. And he was trying to get loose. I'm not exactly sure. It was about fifty yards away. But it looks like they were struggling with each other, so . . .

Q    And then you ran over when you saw who started to struggle?

A    Yeah.

. . . .

Q    . . . While you were attempting to arrest him, did Mr. Voorhees make any statements?

A    Yeah. He stated that like he was going to knock us out and break your [sic] jaw, knock you out one by one. Said that we was all fags. Stuff like that.

. . . .

Q    What happened after he was in handcuffs?

A    We walked him over to the van where we were going to transport him in, but he was still resisting, tensing up. From what I remember, when they put him in the van, he sat down on the edge of the van and started kicking at us.

Q    Kicking as if to try to strike you?

A    Yeah.

A witness at the scene corroborated the descriptions of events given by Officers Pa, Reyes, and Hookano, and by Sgt. Carvalho:

> Q    You were on your break.  Okay.  And what kind of confrontation did you witness?
>
> A    I witnessed them pull over, stop a vehicle.  The driver of the vehicle got out.  I guess they were giving sobriety tests.  I don't know.  But I just saw the officers take the person by the elbows, and the guy started conflicting -- arguing with the officers and resisting with the officers.  And the officers told them to -- I could hear him tell the guy to calm down.
>
> . . . .
>
> Q    And what was going on with that?  He was --
>
> A    He was getting erratic.  He started swearing and
>
> . . . .
>
> [Objection overruled]
>
> THE WITNESS:  I could hear him swearing swear words and trying to get away from the officer, two of the officers.  I don't know which two were up there because it was dark, but I could see across the street.  Had two officers look below and two officers that pulled him over.
>
> And he started resisting the two officers when they pulled him to the side of the street.  And then I could see the other two officers running up to assist.
>
> . . . .
>
> Q    What kind of movements did you witness this driver make as he was --
>
> A    He was trying -- he was -- looked to me like he was trying to fight the officers off.
>
> Q    Like he was trying to fight them?
>
> A    Yeah.  He was getting physical with the officers.  That's what it looked to me.

Officer Pa described Voorhees' demeanor and actions at the police station:

> Q    And was that -- that was on -- that was when you were back at the police station --
>
> A    At the station.
>
> Q    -- on that same day?
>
> A    Mm-hmm.
>
> Q    Yeah.  And when you read the [implied consent for testing] form, did you give him his options regarding chemical testing?

A    I read him the forms, and I told him what -- he continued -- basically, I read the forms. And he was yelling at me, saying he was going to break my jaw. And he just --

Q    He was yelling at you --

A    That he was going to --

Q    -- after you read that or during it?

A    During the reading of the forms, he was --

Q    The whole time you were reading it?

A    Yeah. He was highly agitated and uncooperative. And he was swearing at me, saying that he's going to break my jaw. If he sees me outside, he's going to --

Q    But with expletives mixed in?

A    Yes.

. . . .

Q    . . . And how did the defendant ultimately respond? Did he give a response as to the testing?

A    I took his highly uncooperative demeanor as a refusal, because he just kept yelling, saying that he'd --

Q    He never gave you a yes or no?

A    He never gave me a yes or no. I just --

Q    Just continued to yell?

A    Yeah. He just continued.

. . . .

Q    . . . And what was the defendant's response to that [sanctions for use of intoxicants form]?

A    It was same as the initial one. I was going over the forms with him, and he was highly uncooperative, swearing, yelling at me, saying he was going to basically beat me up.

We have previously held that the following evidence was sufficient to support convictions for driving under the influence of intoxicating liquor (**DUI**):[6]

(1) Defendant's station wagon was weaving within the fast lane; (2) Defendant's eyes were "red glassy bloodshot" and his breath had a strong odor of alcohol; and (3) while

---

[6]    Under former HRS § 291-4 (1999), the elements of DUI are "that (1) [defendant] (2) operated or assumed actual physical control of the operation of any vehicle while (3) under the influence of intoxicating liquor in an amount sufficient to impair his [or her] normal mental faculties or ability to care for himself [or herself] and guard against casualty." Mitchell, 94 Hawai'i at 396, 15 P.3d at 322 (citation omitted).

> performing the field sobriety tests, Defendant lost his
> balance and had coordination problems. . . . ,"[Defendant]
> had a strong odor of alcoholic beverage emitting from his
> breath, very red, watery eyes, and he did speak with a
> thick-tongued slurred speech."

State v. Nishi, 9 Haw. App. 516, 524-25, 852 P.2d 476, 481 (1993). In Ferrer, we held there was sufficient evidence to support a DUI conviction – even though the defendant "pulled over his motorcycle 'right away' and produced, at [the police officer]'s request, a driver's license, vehicle registration, and no-fault insurance card[,]" 95 Hawai'i at 411, 23 P.3d at 746 – where the officer detected a "moderate odor" of alcohol on the defendant's breath and saw that the defendant's "eyes were red, '[h]is demeanor was kinda sluggish' and '[h]is verbal toneage [sic] was kinda slurred[.]" Id. But in Ferrer the trial court also properly considered the result of defendant's intoxilyzer test in finding that the defendant's blood alcohol content exceeded the legal limit.

The Hawai'i Supreme Court held that the following evidence was sufficient to support a DUI conviction:

> Vliet [the defendant] approached the intersection at Kona
> and Mahukona Streets and, without stopping at the stop sign,
> made a right turn. Officer Uehara observed that the smell
> of alcohol emanated from Vliet's breath and that Vliet's
> eyes were red and glassy. Vliet had difficulty producing
> his ID, initially showing Officer Uehara a picture of
> Christ. Indeed, Vliet was unable to locate his ID until
> Officer Uehara pointed it out to him. Upon exiting his
> vehicle, Vliet left the door open, blocking traffic. Vliet
> also "took slow deliberate steps like [ ] ... he was really
> concentrating in [sic] walking." Finally, Vliet had balance
> and coordination problems during every phase of the FST,
> even failing, at times, to follow Officer Uehara's
> instructions.

State v. Vliet, 91 Hawai'i 288, 293, 983 P.2d 189, 194 (1999) (brackets in original).

In this case, viewing the evidence before the District Court "in the strongest light for the prosecution," Mitchell, 94 Hawai'i at 393, 15 P.3d at 319 (citation omitted), there was ample evidence that Voorhees' "normal mental faculties or ability to care for [himself] and guard against casualty" were impaired, HRS § 291E-61(a)(1). Voorhees stopped his vehicle in the middle of the road as he approached the DUI checkpoint when there was no other vehicle or obstruction in the roadway. Once he entered the

21

checkpoint, the police officers detected the odor of alcohol coming from him and saw that his eyes were red, watery, and glassy. He was unable to produce a driver's license, vehicle registration or insurance card. He refused to complete the field sobriety tests, walked away from the police officer and disobeyed Officer Pa's verbal command to stop. He was angry and agitated. He threatened the officers with physical harm. It took four police officers to take him into custody because he physically resisted arrest. He continued to resist after being handcuffed and led to the police van. He tried to kick the officers as he was being put into the van. He could easily have caused injury to himself or others at any point in time. At the police station he continued to yell, swear at, and threaten Officer Pa with physical harm.

There is substantial evidence in the record that Voorhees' mental faculties or ability to care for himself and guard against casualty were impaired by alcohol, even without considering the evidence of his performance on the HGN test. Voorhees displayed a significant lack of judgment and impulse control. When combined with evidence of his consumption of alcohol, we hold that the District Court's erroneous mention of slurred speech when announcing its findings was harmless beyond a reasonable doubt. State v. McDonnell, 141 Hawaiʻi 280, 297, 409 P.3d 684, 701 (2017) ("Error should not be viewed in isolation and considered purely in the abstract, but must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled.") (internal quotation marks and citation omitted).

### D.     Refusal to Submit to Breath, Blood, or Urine Testing

HRS § 291E-15 (Supp. 2010) provides:

> If a person under arrest refuses to submit to a breath, blood, or urine test, none shall be given, except as provided in section 291E-21 [mandatory testing in the event of a collision resulting in injury or death]. Upon the law enforcement officer's determination that the person under arrest has refused to submit to a breath, blood, or urine test, if applicable, then a law enforcement officer shall:

(1)     Inform the person under arrest of the sanctions under section 291E-41 [administrative revocation], 291E-65 [license suspension], or 291E-68 [penalty is petty misdemeanor]; and

(2)     Ask the person if the person still refuses to submit to a breath, blood, or urine test, thereby subjecting the person to the procedures and sanctions under part III or section 291E-65, as applicable;

provided that if the law enforcement officer fails to comply with paragraphs (1) and (2), the person shall not be subject to the refusal sanctions under part III or IV.

In this case, the State concedes that after Voorhees was arrested, Officer Pa did not inform him of the sanctions under HRS §§ 291E-41 or 291E-65.  Since Voorhees was never informed of the refusal sanctions, he is not subject to the sanctions under parts III or IV of HRS Chapter 291E-15.  The Judgment is reversed as to Count 5.

### III.

Based upon the foregoing, the Judgment and Notice of Entry of Judgment entered by the District Court of the Third Circuit on April 22, 2014, is reversed as to the conviction on Count 5 only.  In all other respects, the Judgment and Notice of Entry of Judgment is affirmed.

DATED:  Honolulu, Hawaiʻi, March 12, 2019.

On the briefs:

Elika O. Stimpson,
Deputy Public Defender,
for Defendant-Appellant.

Jason R. Kwiat,
Deputy Prosecuting Attorney,
County of Hawaiʻi,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge

23